**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANGELA BLACK,<br><br>                             Plaintiff,<br><br>                    -v-<br><br>VERIZON COMMUNICATIONS, INC.<br><br>                             Defendant. | 2:20-cv-5309<br>(NJC) (LGD)<br><br>SEALED |

## OPINION AND ORDER

NUSRAT J. CHOUDHURY, United States District Judge:

Plaintiff Angela Black ("Black") brings this action against her employer Verizon Communications, Inc. ("Verizon"), alleging that Verizon exposed her to a hostile work environment based on her sex, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296. (Compl., ECF No. 1.) Black seeks compensatory and punitive damages, as well as attorney's fees and costs. (Compl. at 7.)

Verizon has moved for summary judgment, arguing that no reasonable jury could find the following:

(1) that Black experienced harassment that was sufficiently "severe or pervasive" to state a claim under Title VII or the NYSHRL;[1]

(2) that the alleged harassment was based on Black's sex;

---

[1] As discussed below at Legal Standards Section II, the New York legislature amended the NYSHRL to remove the requirement that that the alleged conduct be "severe or pervasive." However, as the parties agree that the alleged harassing conduct in this case occurred before this change of law, the prior "severe or pervasive" standard applies to Black's NYSHRL claim.

(3) that Black faced a material change to the terms and conditions of her employment as a result of the alleged harassment; or

(4) that Verizon failed to take sufficient action to stop the alleged harassment, as required to hold an employer liable under Title VII and the NYSHRL for the conduct of its employees in non-supervisory roles.

(Mem. Supp. Summ. J. ("Mem."), ECF No. 65-1.)

For the reasons set forth below, I find that genuine disputes of material fact exist as to these issues. Accordingly, I deny Verizon's motion for summary judgment.

## JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Brown brings a claim under a federal statute, 42 U.S.C. § 2000e-2. The Court has supplemental jurisdiction over the state law claim alleged in the Complaint under 28 U.S.C. § 1367(a) because that claim is part of the same case or controversy as the federal claim.

Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391(b)(2) because the Complaint alleges that a substantial part of the events that gave rise to Black's claims occurred in this district. (Compl. ¶ 11.)

## BACKGROUND

The following facts are not in dispute, unless otherwise noted.

### I. The Parties

Verizon is a broadband communications company that provides telecommunications services. (Dobson Decl. Ex. 13, Perrella Decl. ¶ 3, ECF No. 65-14.) Black is a female employee who has worked at Verizon since June 12, 2000. (*See* Compl. ¶¶ 8, 10; Luke Decl. Ex. 1, Black July 11, 2022 Dep. Tr. ("Pl. Tr.") 94:19–21, ECF No. 66-3.) Since around 2017, Black has worked as a Representative based out of the Verizon service center located in Garden City, New York. (*See* Perrella Decl. ¶ 13; Pl. Tr. 98:16–99:2.) The service center is large and contains

several departments and floors. (Pl. Tr. 118:21–119:5.) In her role as Representative, Black

provides companies "with options for communications, such as [] internet access . . . and

determine[s] which of Verizon's business services would best suit their needs." (Pl. Tr. 98:16–

99:2.)

## II. Verizon's Anti-Harassment Policies and Protocols

Verizon is an equal opportunity employer whose Equal Opportunity Employment and

Affirmative Action Policy, which was in force during the events at issue in this litigation, states:

"Verizon's policy is to provide equal employment opportunity ('EEO') to all persons without

regard to . . . gender . . . ." (Dobson Decl. Ex. 1, EOE Policy, ECF No. 65-4.) The version of

Verizon's Code of Conduct that was operative in 2017 expressly states: "Verizon has a policy of

zero tolerance for discrimination, sexual harassment or other harassment based

on . . . gender . . . ." (Dobson Decl. Ex. 2, 2017 Code of Conduct at D000375, ECF No. 65-5.) In

2019, Verizon issued an amended Code of Conduct, which provides in relevant part: "We are

committed to maintaining a workplace free from illegal discrimination or harassment, including

sexual harassment or harassment based on any other legally protected category. We respect and

comply with all laws providing equal opportunity to individuals without regard

to . . . gender . . . ." (Dobson Decl. Ex. 3, 2019 Code of Conduct at D000413, ECF No. 65-6.)

The 2019 Code of Conduct sets forth avenues for reporting sexual harassment, including

"Human Resources, the Ethics Office, or the Legal Department." (*Id.* at D000414.) In particular,

the Ethics Office is available 24/7 and permits anonymous reporting of workplace misconduct.

(2019 Code of Conduct at D000410.) The 2019 Code of Conduct also provides contact

information for the "Verizon Compliance Guideline," which employees can call or email for

guidance on workplace conduct issues. (*Id.* at D000435.)

Verizon provides the operative Code of Conduct to employees on their first day and makes it available for viewing on the company's intranet. (Perrella Decl. ¶¶ 6, 9.) Verizon also trains its employees on anti-discrimination and anti-harassment annually. (Perrella Decl. ¶ 10.) Black received the 2019 Code of Conduct, was trained on the 2019 Code of Conduct's anti-harassment policies, and was aware of the various reporting mechanisms available to her under the 2019 Code of Conduct. (Pl. Tr. 244:13–15, 245:6–247:13.)

Black's employment is also subject to the terms of a collective bargaining agreement between Verizon and the Communication Workers' Union of America, AFL-CIO, Local 1105 (the "Union"), of which Black is a member. (Pl. Tr. 159:6–12, 160:25–161:4; Perrella Decl. ¶ 12.) The collective bargaining agreement provides that "neither the Company nor the Union shall unlawfully discriminate against any employee because of such employee's . . . sex . . ." (Dobson Decl. Ex. 4, Collective Bargaining Agreement art. 20, ECF No. 65-7.)

### III. The Alleged Harassing Conduct

Black alleges that she was harassed by Richard Reiner ("Reiner"). Reiner has been employed by Verizon since around May 1980 and, during the relevant time period, was working as a Special Representative in the Garden City service center. (Dobson Decl. Ex. 16, Reiner Sept. 19, 2022 Dep. Tr. ("Reiner Tr.") 8:20–25, ECF No. 65-17; Dobson Decl. Ex. 12, Reiner Decl. ¶¶ 2–3, ECF No. 65-13.) Like Black, Reiner received a copy of the 2019 Code of Conduct and attended annual trainings on anti-discrimination and harassment. (Reiner Decl. ¶¶ 5–6; Reiner Tr. 9:11–14.) Reiner never supervised Black, nor did the two even work on the same team. (Reiner Decl. ¶ 4; Pl. Tr. 131:20–132:6.) As such, there was no business reason for Black and Reiner to interact. (*See* Pl. Tr. 131:10–13.)

Around May 25, 2019, ABC aired a documentary titled "A Night in Central Park," covering the well-known "Central Park Jogger case" from the late 1980s, where five teenagers

4

(the "Central Park Five") were wrongfully convicted and later exonerated for the attack and sexual assault of a woman in Central Park. (Reiner Decl. ¶ 7; Pl. Tr. 116:18–25.) The documentary featured old interview footage of Black, who is the sister of one of the exonerated teenagers. (Def.'s Ltr. Mot. Pre-Mot. Conf. Summ. J. Ex. 7, Investigation Report at D001371, ECF No. 53-9; Pl. Tr. 46:2–8.)

Many of Black's colleagues watched the documentary and recognized her, including Reiner. (Reiner Decl. ¶ 7.) The next day, on May 26, 2019, while Black was on the phone with a customer, Reiner said to her, "I saw a beautiful woman on TV last night, was that you?" (Pl. Tr. 117:22–118:2, 130:21–23.) Black did not respond to this question and, after this interaction, did not speak to Reiner for the rest of that day. (Pl. Tr. 130:24–131:9.) Black did not contemporaneously report this interaction to Verizon or the Union. (Pl. Tr. 133:2–6, 160:11–21.)

According to Black, after the May 26, 2019 interaction, Reiner began "leering" at Black, which she also described as "glaring" and "staring aggressively." (Pl. Tr. 169:9–13; 213:15–16.) From the period of May 26, 2019 to July 11, 2019, Reiner leered at her "[e]very day he was in the office." (Pl. Tr. 168:19.) Though Black was not able to quantify the exact frequency of Reiner's stares, she estimated that they started out at "once, maybe twice" per day. (Pl. Tr. 216:7–8.) Reiner disputes these accusations. (Investigation Report at D001380.)

In addition, the two had an interaction in which Reiner asked Black about her family in a way that made her feel uncomfortable, although, again, Black's and Reiner's accounts differ on exactly what happened. (Pl. Tr. 154:18–23, 158:17–25; Reiner Decl. ¶¶ 8–9.) According to Black, Reiner told to her that because she and her brother had different fathers, he was not her "actual brother." (Pl. Tr. 155:18–22.) Based on Reiner's disclosure of the fact that he knew Black and her brother had different fathers, Black believed that Reiner had been researching her

and her family and that, after seeing her in the documentary, he had become

"sexually . . . attracted" to her, "but in a hostile way." (Pl. Tr. 157:2–158:3.) According to

Reiner, he merely asked Black "why her brother had a different last name than she did." (Reiner

Decl. ¶ 8.) This conversation took place at some point between May 26, 2019 and July 11, 2019,

although the exact date is not clear from the record. (*See* Reiner Decl. ¶ 8 (attesting that the

conversation happened on or about May 26, 2019); Pl. Tr. 158:17–21 (testifying that the

conversation happened sometime after May 26, 2019 but before July 11, 2019).)

On July 11, 2019,[2] Reiner asked Black about a tattoo she has on her breast, although,

again, the accounts differ between Black and Reiner, as well as Mattee Pruitt, a Workforce

Administrator at the Garden City service center who witnessed the incident. Their respective

accounts are as follows:

- **Black's Account:** According to Black, she has a tattoo on her breast that "you cannot
  see" and which she has "never made visible in [the] office." (Pl. Tr. 172:14–19; *see also*
  Pl. Aff. ¶ 11, ECF No. 66-4 (Black attesting, "I have a tattoo on my left breast that is not
  visible unless you are looking down my shirt").) Black testified that Reiner had "look[ed]
  down . . . into [her] dress" on multiple occasions. (Pl. Tr. 172:19–173:3.) On that day, he
  had looked "so intensely" that he could see her tattoo. (*Id.* at 172:22–173:3.) He
  subsequently asked, "What is on your boob?" (*Id.*) Pruitt, who was "in a conversation"
  with Black, asked Black, "What did he just say to you?" (*Id.* at 173:6–10.) Black
  responded, "I just hope he doesn't say it again." (*Id.* at 173:14–15.) Reiner then said, "I

---

[2] In her deposition, Black testified that this incident happened "in or around early August 2019" but that she could not remember the exact date. (Pl. Tr. 151:14–152:10.) However, documentary evidence indicates that it happened on July 11, 2019, and in her Rule 56.1 Responses, Black admits that it happened on July 11, 2019. (*See* Dobson Decl. Ex. 8, July 11, 2019 Case Detail Hotline Report, ECF No. 65-10; Rule 56.1 Statement Resps. Objs. ¶ 46, ECF No. 66-1.)

want to know what the tattoo says on your boobs." (*Id.* at 173:16–19.) Black then told Reiner to get away from her, at which point he left. (*Id.* at 175:22–176:3.)

- **Reiner's Account:** According to Reiner, he was walking to the printer and noticed Black's tattoo, which was visible because she was wearing a low-cut dress. (Reiner Tr. 13:15–21.) He asked, "What is that?" and Black "quickly lifted her dress." (*Id.* at 13:21–22.) Because he did not want her to think that he was referring to her breasts, he said, "Not the boobs, the tattoo." (*Id.* at 13:22–25.) Reiner maintains that he did not say the word "boob" more than once. (Reiner Decl. ¶ 8.)

- **Pruitt's Account:** According to Pruitt, Pruitt was on the phone at the time and did not hear exactly what Reiner said except the word "boob." (Dobson Decl. Ex. 15, Pruitt Sept. 29, 2022 Dep. Tr. ("Pruitt Tr.") 15:12–25; 16:18–22, ECF No. 65-16.) After getting off the phone, Pruitt asked Reiner, "What did you say?" Black then said to Reiner, "Do not answer." (*Id.* at 17:2–12.) After Reiner left, Black explained to Pruitt that he had said, "What is on your boob?" (*Id.* at 17:13–17.)

With Pruitt's permission, Black left work early that day. (Pruitt Tr. 28:25–29:11; Pl. Tr. 178:3–19.)

Shortly thereafter, Black spoke to Susan Nichols ("Nichols"), the Union Representative, and "explained to her everything leading up to that point." (Pl. Tr. 186:4–20.) The parties agree that Black told Nichols that she did not want Reiner to be fired, although Black further contends that she told Nichols that she wanted Reiner to be "transferred." (Rule 56.1 Resps. Objs. ¶ 54, ECF No. 66-1; Pl. Tr. 184:5–19.) On July 12, 2019, Nichols came to the service center and spoke to Reiner, instructing him to "stay away from," "not comment to," and "not talk to" Black. (Pl. Tr. 186:13–187:12, 193:14–22; Reiner Tr. 15:6–15.)

The parties dispute whether Reiner complied with Nichols' instruction. (Rule 56.1 Statement Resps. Objs. ¶ 57.) Verizon, citing Reiner's deposition testimony, asserts that Reiner fully complied. (*Id.* (citing Reiner Tr. 15:13–17).) Black, citing her deposition testimony, asserts that Reiner began disobeying the direction the very next day and that, although she reported Reiner's continued leering to Joann Lee ("Lee"), one of the team leaders in Black's unit, Reiner's leering did not stop. (*Id.* (citing Pl. Tr. 194:16–209:11, 219:9–225:22).) She testified that, after her conversation with Nichols, Reiner's staring increased to three or four times a day, and that he would deliberately walk by Black's desk. (Pl. Tr. 216:5–17.) According to Black, many of her coworkers recognized that he was staring at her. (*Id.* at 216:9–17.)

Around the same time, Pruitt also reported the incident to her supervisor, Jason Murray ("Murray"), and submitted an official request for investigation through "Verizon's Compliance hotline." (Pruitt Tr. 19:13–25; Dobson Decl. Ex. 8, July 11, 2019 Case Detail Hotline Report at D001383–84, ECF No. 65-10.) Shortly thereafter, Black spoke to an employee from "either [the] ethics or EEO or HR" department, whose name she cannot recall. (Pl. Tr. 197:3–4.) During that conversation, Black informed the employee about Reiner's initial comment on May 26, 2019, his subsequent comments about her relationship to her brother, the July 11, 2019 incident, and his "glaring stares." (Pl. Tr. 174:4–8; 197:9–19.) Black separately spoke to Administrative Manager Deborah Jacobsen ("Jacobsen"), requesting to move desks due to Reiner's staring. (*Id.* at 198:19–20, 200:24–201:6.) Black does not remember exactly when she spoke to Jacobsen, but Jacobsen immediately granted Black's request and Black moved desks that same day. (198:21–

23; 201:4–6.) Black testified, however, that the desk change did not stop Reiner from continuing to "stalk" her. (Pl. Tr. 203:11–210:14, 219:9–225:22.)[3]

According to Black, until sometime in October 2019, Reiner stared at her every day that both she and Reiner were in the office. (Pl. Tr. 168:17-20.) As to the pervasiveness of Reiner's behavior, Black testified:

> I mean, for me, this is months of me complaining, moving my desk, contacting the union, contacting HR, doing everything I could to stop him, I just want to work, just want to do my job, just want to try to continue to live, and what I was feeling at that time with my family, I was happy, and he took all of that away from me.

(Pl. Tr. 224:14–22.)

On October 2, 2019, Black reported to one of her team leaders that Reiner was walking up and down the aisle where she sat. (Pl. Tr. 203:11–21.) Later that day, Murray, Jacobsen and Union representative Tony Borelli ("Borelli") met with Reiner and told him that his "presence" in the unit in which Black worked was "causing feelings of discomfort for an employee." (Dobson Decl. Ex. 9, Oct. 2, 2019 Meeting Report I, ECF No. 65-11; *see also* Reiner Decl. ¶ 16.) At the meeting, they instructed Reiner to "stay out of that area of the office" while the matter was being investigated and that failure to comply "would be considered insubordination and disciplinary action could occur, up to and including dismissal." (Oct. 2, 2019 Meeting Report I; *see also* Reiner Decl. ¶ 16.) The parties dispute whether Reiner complied with this instruction. (Reiner Decl. ¶ 17; Pl. Tr. 219:9–225:22.)

---

[3] Black's Opposition to Verizon's Motion for Summary Judgment asserts that Black moved desks twice, but the record does not identify when Black moved desks a second time. (Opp'n Mot. Summ. J. ("Opp'n") at 9, ECF No. 66 (arguing that "Plaintiff was forced to move her desk twice" with no citation to the record).)

Another incident occurred on October 9, 2025, over which the parties dispute what exactly happened. According to Black, during a 15-minute break, she went to the section of the service center where Reiner's desk was located to visit her "close and dear friend" Erika Becker ("Becker"). (Pl. Tr. 219:23–220:3.) Reiner was not at his desk at the time, and Black testified that she would not have gone to that section had Reiner been at his desk. (*Id.* at 220:3–11.) While Black and Becker were talking, Reiner returned and began staring at Black. (*Id.* at 220:15–20.) At this point, Becker lifted her standing desk and Brown "went down to [her] knees" to hide from Reiner. (*Id.* at 220:20–221:3.) According to Reiner, Black "stood in front of [him] for several minutes while visiting [Becker]" and was "staring" at him. (Reiner Decl. ¶ 17.) Reiner "felt that [Black] was trying to bait [him] to respond." (*Id.*)

After the October 9, 2025 incident, Reiner emailed Murray the following:

> OK, the woman who claims she is so uncomfortable around me has been standing in front of me now for several minutes, visiting her friend. She is looking at me, perhaps to bait me into saying something. Needless to say, this is making me most uncomfortable. I expect that shortly, she will be taken into a conference room where you will impose the same restrictions that have been imposed upon me. Clearly, her discomfort is a matter [of] convenience.

(Rule 56.1 Statement Resps. Objs. ¶ 68; Investigation Report at D001371.)[4] On October 10, 2019, Murray and Lee spoke to Black and, without identifying Reiner by name, informed her of Reiner's complaint. (Dobson Decl. Ex. 10, Documentation of Black Warning, ECF No. 65-12.) Specifically, Black was told the following:

> It has come to my attention that your presence in Rich Ramosk's unit is causing feelings of discomfort for an employee. For the time being, while this matter is being investigated, I am now giving you a directive to stay out of that area of the

---

[4] Verizon's investigation report into Reiner's conduct recites a part of this email. (Investigation Report at D001371.) In her Responses & Objections to Verizon's Rule 56.1 Statement, Black admits that Reiner wrote this email. (Rule 56.1 Resps. Objs. ¶ 68.) The email itself, however, is not in the record provided by the parties to the Court on Verizon's Motion for Summary Judgment.

> office. If you need to communicate with an associate, you should be using Jabber or asking a manager for assistance, you should not be walking up to their desk even if its to speak to a friend. We would ask that you do that in a breakroom or lounge rather than their desk. If you fail to follow this directive, that would be considered insubordination and disciplinary action could occur, up to and including dismissal.

(*Id.*) Black subsequently informed supervisors at Verizon that she was planning to hire a lawyer. (Investigation Report at D001372; Pl. Tr. 224:22–225:4.)

Black took a leave of absence beginning on October 10, 2019. (Pl. Aff. ¶ 33.) After the start of the COVID pandemic in March 2020, Black transitioned to working remotely. (Perrella Decl. ¶ 20.) As of the filing of the instant Motion, Black had not worked in-person at the Garden City service center since October 2019. (Pl. Tr. 240:9–11, 241:19–243:3.) Likewise, Black has not interacted with Reiner in any way since October 2019. (Pl. Tr. 243:24–244:9.)

Human Resources Manager Michele Perrella ("Perrella") was tasked with investigating Black's allegations. (Perrella Decl. ¶ 14–15.) During the 2019 investigation, Perrella conducted interviews of numerous employees, including Black, Reiner, and Pruitt. (Perrella Decl. ¶ 17.) One interviewee, ███████████████████████ told Perrella ███████████████████ ███████████████████████████████████████████ (Investigation Report at D001377.) In his interview, Reiner denied intentionally "glar[ing]" at Black. (Investigation Report at D001380.) Perrella concluded that Reiner had engaged in inappropriate and unprofessional workplace behavior and, accordingly, issued a document advising Reiner of Verizon's anti-harassment policies and warning him that "any further violations of policy or the Code of Conduct may lead to further disciplinary action." (Perrella Decl. ¶ 18; Dobson Decl. Ex. 11, Perrella Investigation Ltr., ECF No. 53-13.) Verizon also required employees at the Garden City service center to undergo additional training to remind them of the company's policies. (Pl. Tr. 246:2–6.)

## PROCEDURAL HISTORY

On November 3, 2020, Black filed the Complaint in this action. (Compl.) Verizon filed its Answer on March 5, 2021. (ECF No. 10.) The case was originally assigned to District Judge Gary R. Brown. (Elec. Order, Nov. 4, 2020.) On October 10, 2023, the case was reassigned to my docket. (Elec. Order, Oct. 10, 2023.)

On October 20, 2023, Verizon timely filed a letter motion seeking a pre-motion conference in anticipation of its Motion for Summary Judgment. (ECF No. 51.) Black timely filed an opposition letter on November 9, 2023. (ECF No. 54; Elec. Order, Oct. 27, 2023.) On January 5, 2024, I held a pre-motion conference with the parties. (*See* Min. Entry for Jan. 5, 2024 Hr'g, Jan. 7, 2024.) At the conference, I stated my initial view that there was, at a minimum, a disputed question of material fact as to whether the alleged harassment was sufficiently severe or pervasive to constitute a hostile work environment—specifically, whether the alleged harassment continued after Verizon supervisors directed Reiner not to engage with Black. (*Id.*) I directed Verizon to file a letter informing the Court whether it intended to proceed with filing its Motion for Summary Judgment, and Verizon filed a letter on January 11, 2024 indicating that it would pursue such a motion. (*Id.*; ECF No. 60.) On January 12, 2024, I issued a briefing schedule, and on January 29, 2024, I granted Verizon's request for an extension of that schedule. (Elec. Order, Jan. 12, 2024; ECF No. 61; Elec. Order, Jan. 29, 2024.) Pursuant to the briefing schedule and the Court's recommended bundling practices, the parties filed their motion papers and supporting materials on the docket on April 5, 2024. (Mot. Summ. J. ("Mot."), ECF No. 65; Mem. Supp. Summ. J. ("Mem."), ECF No. 65-2; Opp'n Mot. Summ. J. ("Opp'n"), ECF No. 66; Reply Supp. Summ. J. ("Reply"), ECF No. 67.)

12

Along with its motion, Verizon filed a Memorandum in Support (Mem.), its Rule 56.1

Statement (Rule 56.1 Statement, ECF No. 65-1), and a declaration by its counsel Kimberly N.

Dobson (Dobson Decl., ECF No. 65-3), attaching the following exhibits:

(1) Verizon's Equal Opportunity Employer Policy (Dobson Decl. Ex. 1, EOE Policy, ECF No. 65-4);

(2) Verizon's 2017 Code of Conduct (Dobson Decl. Ex. 2, 2017 Code of Conduct, ECF 65-5);

(3) Verizon's 2019 Code of Conduct (Dobson Decl. Ex. 3, 2019 Code of Conduct, ECF No. 65-6);

(4) An excerpt of the Collective Bargaining Agreement between Verizon and the Union (Dobson Decl. Ex. 4, Collective Bargaining Agreement, ECF No. 65-7);

(5) The job description for Black's role (Dobson Decl. Ex. 5, Black's Job Description, ECF No. 65-8);

(6) A summary of Verizon's anti-harassment training completed by Black (Dobson Decl. Ex. 6, Training Summary, ECF No. 65-9);

(7) Perrella's report summarizing her investigation results (Ltr. Mot. Summ. J. Ex. 7, Investigation Report, ECF No. 53-9);[5]

(8) A summary of Pruitt's July 11, 2019 report to Verizon's Compliance hotline (Dobson Decl. Ex. 8, Pruitt Report, ECF No. 65-10);

(9) A report summarizing Verizon supervisors' October 2, 2019 meeting with Reiner (Dobson Decl. Ex. 9, Oct. 2, 2019 Meeting Report I, ECF No. 65-11);

(10) An October 11, 2019 email memorializing the warning given to Black (Dobson Decl. Ex. 10, ECF No. 65-12);

(11) Additional documentation summarizing Verizon supervisors' October 2, 2019 meeting with Reiner (Ltr. Mot. Summ. J. Ex. 11, Oct. 2, 2019 Meeting Report II, ECF No. 53-13);[6]

(12) Reiner's sworn declaration (Dobson Decl. Ex. 12, Reiner Decl., ECF No. 65-13);

(13) Perrella's sworn declaration (Dobson Decl. Ex. 13, Perrella Dec., ECF No. 65-14);

(14) Excerpts of the transcript of Black's deposition testimony (Dobson Decl. Ex. 14, Pl. Tr. Excerpts, ECF No. 65-15);

(15) Excerpts of the transcript of Pruitt's deposition testimony (Dobson Decl. Ex. 15, Pruitt Tr., ECF No. 65-16); and

(16) Excerpts of the transcript of Reiner's deposition testimony (Dobson Decl. Ex. 16, Reiner Tr., ECF No. 65-15).

---

[5] Verizon did not file Exhibit 7 on the public docket as a part of Verizon's fully briefed Motion for Summary Judgment but filed this document under seal in support of Verizon's letter motion seeking a pre-motion conference in anticipation of its Motion for Summary Judgment.

[6] Verizon did not file Exhibit 11 on the public docket as a part of Verizon's fully briefed Motion for Summary Judgment but filed this document under seal in support of Verizon's letter motion seeking a pre-motion conference in anticipation of its Motion for Summary Judgment.

Black filed a memorandum in opposition ("Opposition") (Opp'n), her Responses and Objections to Verizon's Rule 56.1 Statement (Rule 56.1 Statement Resps. Objs., ECF No. 66-1), and a declaration by her counsel, John Luke (Luke Decl., ECF No. 66-2), attaching the following exhibits: (1) the full transcript of Black's deposition (Pl. Tr., ECF No. 66-3) and (2) an affidavit by Black (Pl. Aff., ECF No. 66-4). Verizon filed a reply brief ("Reply") (Reply, ECF No. 67).

The Motion is now fully briefed.

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a material question of fact. *Balderramo v. Go N.Y. Tours Inc.*, 668 F. Supp. 3d 207, 219 (S.D.N.Y. 2023) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).[7] "A fact is material if it might affect the outcome of the suit under the governing law." *Cunningham v. Cornell Univ.*, 86 F.4th 961, 980 (2d Cir. 2023) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of "material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In order to defeat summary judgment, the non-moving party must set forth sufficient facts showing that there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c). The non-moving party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Daly v. Westchester Cnty. Bd. of Legislators*, No. 23-1220-CV,

---

[7] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, brackets, and citations.

2024 WL 3264125, at *2 (2d Cir. July 2, 2024). "Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Banes*, 593 F.3d 159, 166 (2d Cir. 2010). A court considering whether summary judgment is appropriate "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Cunningham*, 86 F.4th at 980; *see also Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 939 (2d Cir. 2024) ("We may find for the movant defendant only if we conclude that on the record presented, considered in the light most favorable to the non-movant plaintiff, no reasonable jury could find in the plaintiff's favor."). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

## II.   Hostile Work Environment

A hostile work environment claim under Title VII requires a plaintiff to show that her workplace was "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [] her employment were thereby altered." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 101 (2d Cir. 2020); *see also Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998) (holding that Title VII is not "a general civility code" but rather "forbids only behavior so objectively offensive as to alter the conditions of the victim's employment"). This inquiry "involves both objective and subjective elements." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009). To prevail on a hostile work environment claim, the plaintiff must show (1) that the alleged conduct was "severe or pervasive enough to create an *objectively* hostile or abusive work environment" and (2) that the plaintiff "*subjectively* perceive[d] that environment to be abusive." *Id.* (emphasis added). In the objective inquiry, courts assess the totality of circumstances, weighing various factors, including: "(1) the frequency of the discriminatory

conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). The plaintiff must prove that she faced "harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse"; in this inquiry, however, the Second Circuit has cautioned against "setting the bar too high." *Id.*

The plaintiff must also prove that her membership in a protected class caused her to experience a hostile work environment. *Id.* at 112; *see also* 42 U.S.C. § 2000e-2(a) (prohibiting adverse employment actions "*because of* such [employee's] race, color, religion, sex, or national origin" (emphasis added)). In other words, courts apply a "but-for" causation test to determine whether the plaintiff would have experienced the same hostile work environment had she not been a member of the protected class at issue (here, Black's protected class is sex). *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020).

On October 11, 2019, the New York legislature amended N.Y. Exec. Law § 296 to remove the "severe or pervasive" requirement for discrimination claims brought under the NYSHRL. *See* N.Y. Exec. Law § 296(1)(h) (creating a cause of action for harassment claims "regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims"); *Maiurano v. Cantor Fitzgerald Securities*, No. 19-cv-10042, 2021 WL 76410, at *3 n.2 (S.D.N.Y. Jan. 8, 2021). The amendment, however, only applies to NYSHRL claims that accrued before the amendment became effective on October 11, 2019. *Maiurano*, 2021 WL 76410, at *3 n.2; N.Y. Senate Bill S6594/A8424 ("Section[] one . . . shall only apply to claims accrued under such sections on or after the effective date of such section[].").

Verizon argues that the last alleged act of harassment occurred on October 1, 2019, when Reiner allegedly reported Black's presence in his section of the service center (i.e., before the NYSHRL amendment became effective). (Mem. at 10–11.) Despite Verizon's contention, I find that the last incident contributing to Black's hostile work environment claim is, at least arguably, the warning she received from her superiors to stay away from Reiner. Still, the record places this event on October 10, 2019 (i.e., one day before the amendment to the NYSHRL became effective). (*See* Rule 56.1 Resps. Objs. ¶¶ 69–70 (Black "admit[s]" that this meeting occurred "on or about October 10, 2019"); Pl. Tr. 221:16–18 (testifying that the meeting happened "at the end of the day," "maybe about 5:00"); Documentation of Black Warning (email dated October 11, 2019 at 10:21 AM memorializing the meeting with Black and indicating that, by that time, the meeting had already occurred). Likewise, Black agrees in her Opposition that the "severe or pervasive" standard applies to both her Title VII and NYSHRL claims. (Opp'n at 3.)

Therefore, I analyze Black's NYSHRL claim under the pre-amendment standard. Under that standard, "claims brought under [the NYSHL] are analytically identical to claims brought under Title VII." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011).

When a plaintiff sues her employer for hostile work environment, the plaintiff "must show a specific basis for imputing the objectionable conduct to the employer." *Cain v. McDonough*, No. 23-7302-CV, 2024 WL 5165548, at *1 (2d Cir. Dec. 19, 2024) (summary order) (citing *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015)). "An employer's liability for hostile work environment claims depends on whether the underlying harassment is perpetrated by the plaintiff's supervisor or the plaintiff's non-supervisory co-workers." *Id.* (citing *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015)). "When the harassment is attributable to a

17

co-worker, the employer will be held liable only for its own negligence." *Id.* (citing *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998)). In such cases, the plaintiff must show either (1) that the "employer failed to provide a reasonable avenue for complaint" or (2) that the employer "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch*, 588 F.3d at 762. In order to establish employer liability on a "fail[ure] to take appropriate remedial action" theory, the plaintiff must show (1) that "*someone* had actual or constructive knowledge of the harassment," (2) that "the knowledge of this individual can be imputed to the employer," and (3) that "the employer's response, in light of that knowledge, was unreasonable." *Id.* at 763.

## DISCUSSION

Verizon moves for summary judgment on Black's claims, arguing that no reasonable jury could find Verizon liable under Title VII or the NYSHRL.

First, Verizon argues that the record evidence cannot establish that the alleged conduct was sufficiently "severe or pervasive" to give rise to a Title VII or NYSHRL claim. (Mem. at 11–16.) As to severity, Verizon characterizes Reiner's statements as at most "mere offensive utterances" that do not create a hostile work environment. (Mem. at 12.) In support, it cites Second Circuit cases in which the Court found that, taking into account the totality of circumstances, conduct similar to that alleged here did not rise to a level of "severity" to be actionable under Title VII. *See Agosto v. New York City Dep't Educ.*, 982 F.3d 86, 103 (2d Cir. 2020) (allegations of supervisor suggestively licking a lollipop not sufficiently severe); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (no hostile work environment claim where claim was based on two isolated incidents: (1) the plaintiff's supervisor commenting on her posterior and (2) the supervisor using a piece of paper to touch the plaintiff's breast). As to

pervasiveness, Verizon characterizes the alleged events as "two (2) isolated comments" by Reiner towards Black "that occurred approximately two (2) months apart," plus claims that Reiner "stared" at her. Mem. at 12; *see Agosto*, 982 F.3d at 102–03 (2d Cir. 2020) (allegations of occasional "star[ing]," "sneer[ing]," and "cat-call[ing] and clap[ping]" not sufficiently severe or pervasive); *Lewis v. City of Norwalk*, 562 F. App'x 25, 28 (2d Cir. 2014) (supervisor "licking . . . his lips" and "leering" "sporadically over time" not sufficiently severe or pervasive); *Beiter v. Runyon*, 50 F. App'x 32, 35 (2d Cir. 2002) (summary order) (no hostile work environment claim where the supervisor's "objectionable conduct" included: (1) running his hand up and own plaintiff's arm and, later that same day, rubbing his hand over her back in the area of her bra strap; (2) telling plaintiff to limit her walking around because other supervisors were watching her; (3) being overly friendly with plaintiff and attempting to engage her in conversation about non-work matters; and (4) "walking through [plaintiff's] unit and watching [plaintiff] even when [the supervisor] was not assigned to that unit").

Verizon also cites a number of district court cases in which those courts determined that the conduct at issue was not sufficiently "severe or pervasive": *Alva v. Syosset Hosp.*, No. 13-cv-4849, 2018 U.S. Dist. LEXIS 126299, at *13 (E.D.N.Y. July 26, 2018); *MacMaster v. City of Rochester*, No. 05-cv-6509, 2007 U.S. Dist. LEXIS 72842, at *24–25 (W.D.N.Y. Sept. 28, 2007); *Godineaux v. LaGuardia Airport Marriott Hotel*, 460 F. Supp. 2d 413, 422–23 (E.D.N.Y. 2006); *DeSimone v. JP Morgan/Chase Bank*, No. 02-cv-7039, 2004 U.S. Dist. LEXIS 25621 (S.D.N.Y. Dec. 22, 2004); *Spina v. Our Lady of Mercy Medical Ctr.*, No. 97-cv-4661, 2003 WL 22434143, at *9 (S.D.N.Y. Oct. 22, 2003); *O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 386 (S.D.N.Y. 2001); *Dayes v. Pace Univ.*, 2 F. App'x 204, 207 (2d Cir. Feb. 5, 2001);

*Holtz v. Rockefeller & Co., Inc.*, No. 96-cv-9484, 1999 U.S. Dist. LEXIS 17682, at *5 (S.D.N.Y. Nov. 17, 1999).

Second, Verizon argues that no reasonable jury could find that Black experienced the alleged hostile work environment *because of* her sex. (Mem. at 13.) To the extent Reiner harassed Black, Verizon argues, it was because of his discovery that her brother was one of the exonerated Central Park Five, not because of her sex. (Mem. at 13; *see also* Pl. Tr. 149:3–25 (Black testifying that the "leering" did not start until Reiner saw her on TV).) Verizon also points to employee ███████████████████████████████████████████████████████ ███████████████████████████████████████████ (Mem. at 8; *see also* Investigation Report at D001377.)

Third, Verizon asserts that Black "suffered no material change to the terms or conditions of her employment" but does not support this argument with any reference to undisputed facts in the record or legal authority. (*See* Mem. at 1.)

Fourth, Verizon argues that, even if Black experienced a hostile work environment, she cannot, as a matter of law, hold Verizon liable because Reiner, the alleged harasser, was not her supervisor and no reasonable jury could find that Verizon failed to act sufficiently to stop the harassment. (Mem. at 16–18.) Verizon points to, among other things: (1) Verizon's Code of Conduct meant to address harassment and discrimination, of which Black testified she was aware (Mem. at 17; Pl. Tr. 245:17–20); (2) Pruitt's testimony that she reported the tattoo incident the day she witnessed it, and that Verizon subsequently conducted an investigation (Mem. at 18; Pruitt Tr. 19:9–25; Pruitt Report.); (3) Verizon supervisors' decision to instruct Reiner not to interact with Black during the pendency of the investigation (Mem. at 18; Oct. 2, 2019 Meeting Report I; Oct. 2, 2019 Meeting Report II); and (4) the supervisors' decision to provide Reiner

with a warning and additional training following the conclusion of the investigation (Mem. at 18; Reiner Decl. ¶ 20.)

Black opposes summary judgment, arguing that there are genuine disputes of material fact relating to each of the issues identified by Verizon. Concerning Verizon's argument that no reasonable jury could find that the alleged conduct was sufficiently "severe or pervasive," Black cites her testimony suggesting that the conduct was both intense and frequent. (Opp'n at 5; Pl. Tr. 221:5–16 (testifying that other women referred to Reiner's conduct as "creepy"); Pl. Tr. 216:5–9 (testifying that his staring increased from once or twice per day to three or four times per day).) Black also cites her testimony that on one occasion she had to kneel on the floor behind a co-worker's desk to avoid Reiner's stare. (Opp'n at 5; Pl. Tr. 220:15–221:9.) She emphasizes that this conduct continued for 13 weeks and argues that the conduct was "sufficiently continuous and concerted" to meet the standard under Title VII and the NYSHRL. (Opp'n at 5 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 139 (2d Cir. 1997)).)

Black cites *Kirkland v. Speedway LLC*, a Northern District of New York case where the court denied the defendant's motion for summary judgment over its employee's NYSHRL hostile work environment claim because a reasonable jury could consider "pervasive" the evidence indicating that the alleged harasser "was always staring and calling her 'hun' and 'baby girl.'" 260 F. Supp. 3d 211, 224 (N.D.N.Y. 2017). Black distinguishes *Alva*, *Spina*, *Holtz*, and *McMaster*, four of the cases cited by Verizon. (Opp'n at 6.) She also distinguishes *Iganamorte v. Cablevision Sys Corp.*, No. 03-cv-5973, 2006 U.S. Dist. LEXIS 67872 (E.D.N.Y. Sept. 21, 2006), *Gonzalez v. Kahan*, No. 88-cv-922, 1996 U.S. Dist. LEXIS 22715 (E.D.N.Y. Nov. 15, 1996), and *Lamar v. Nynex Servs. Co.*, 891 F. Supp. 184, 185 (S.D.N.Y. 1995), three cases not

cited by Verizon. (Opp'n at 7.) Black does not address five other cases cited by Verizon—

*Godineaux*, *DeSimone*, *O'Dell*, *Dayes*, and *Quinn*. (*See generally* Opp'n.)

As to whether Black's sex was the cause of the alleged hostile work environment, Black

cites her testimony in which she stated her belief that Reiner's actions were motivated by his

sexual attraction to her. (Opp'n at 4; Pl. Tr. 142:23–143:20.) She also points out that there is no

evidence in the record indicating that Reiner stared at any men in the office, although at least one

other woman, █████, reported that Reiner stared at her. (Opp'n at 4; Investigation Report at

D001377.)

As to whether the alleged harassment altered the terms and conditions of Black's

employment, Black points to evidence in the record indicating (1) that the alleged harassment

affected her relationship with her husband (Opp'n at 7; Pl. Tr. 112:16–114:7) and (2) that she

ultimately took a disability leave of absence from her role at Verizon (Opp'n at 7; Pl. Tr. 225:4–

6).

In response to Verizon's argument that it cannot be held liable for Reiner's conduct as

Black's non-supervisor coworker, Black again argues that the harassment persisted for thirteen

(13) weeks and that she had to move desks to avoid him. (Opp'n at 8.) She also argues that

although Verizon opened an investigation into Reiner on or around July 11, 2019, it did not

discipline Reiner until November 20, 2019. (Opp'n at 9; Reiner Decl. ¶¶ 14, 20.)

On reply, Verizon asks the Court to deem all facts proposed in its Rule 56.1 Statement as

admitted, arguing that the denials raised by Black (regarding Paragraph 48, 51, 57, and 66) are

"immaterial." (Reply at 2–4.) It also asks the Court to strike Black's Affidavit as inadmissible

because it was not notarized or made under penalty of perjury pursuant to 28 U.S.C. § 1746. (*Id.*

at 3.) Concerning the substance of Black's claims, Verizon argues again that no reasonable jury

could find that the alleged conduct was sufficiently "severe or pervasive" under Title VII and NYSHRL. (Reply at 5–8.) Verizon contends that Black failed to address certain cases cited in its opening brief and disagrees with Black's attempts to distinguish other cases. (*Id.*) Verizon also suggests that the "terms and conditions of [Black's] employment" were not altered by the alleged harassing conduct, but rather by other factors in Black's life. (Reply at 8.) In particular, it cites portions of Black's deposition testimony where she stated that around the same time her sister was in the hospital being treated for cancer (Pl. Tr. 238–239), that she was concerned that her husband was being unfaithful (*id.* at 256:4–12), and that she had been taking medication "on and off" for following her PTSD diagnosis in 2002 (*id.* at 256:13–257:1.) Finally, Verizon reasserts its position that there is not a sufficient basis to hold it liable for Reiner's conduct as a non-supervisor employee, maintaining that "[w]henever [Black] raised a concern, it was appropriately addressed by Verizon." (Reply at 9–10.)

As explained below, I find that there are disputed issues of material fact as to all of the issues Verizon identified.

## I.    Threshold Evidentiary Issues

Verizon raises two threshold matters that I must address before reaching the merits of its Motion.

First, Verizon argues that I should deem as "admitted" *all* facts set forth in its Rule 56.1 Statement, on the ground that, in Verizon's view, the four facts that Black "denied" in her response (Rule 56.1 Resps. Objs. ¶¶ 48, 51, 57, 66) are immaterial to the resolution of Verizon's summary judgment motion. (Reply at 2–4.) As an initial matter, Local Rule 56.1 directs the movant on summary judgment to provide a "statement . . . of the *material* facts as to which the moving party contends there is no genuine issue to be tried." *Id.* (emphasis added). If Verizon had thought these four disputed facts were not material, then it should not have included them in

its Rule 56.1 Statement. Verizon relies on *Guzman v. Crothall Healthcare Inc.*, No. 17-cv-4306, 2021 WL 5048993 (E.D.N.Y. Sept. 29, 2021) for its position that all facts in its Rule 56.1 Statement should be admitted. *Guzman*, however, is inapposite. There, the court deemed a fact admitted where the plaintiff's stated basis for denying knowledge as to whether two employees reviewed certain records "d[id] not materially dispute" the fact proposed in the Rule 56.1 Statement. *Id.* at *3 n.15. Here, the record materially disputes the facts presented in the four paragraphs of Verizon's Rule 56.1 Statement that Black "denied." (Rule 56.1 Resps. Objs. ¶¶ 48, 51, 57, 66) For example, in Paragraph 57, Verizon cites Reiner's deposition testimony to advance the fact that Reiner complied with Nichols' directive to stay away from Black. (*Id.* ¶ 57; Reiner Tr. 15:13–17.) Black, however, testified that Reiner did not comply and, in fact, that his leering increased to three to four times per day after he received that directive. (Pl. Tr. 216:5–17.) Accordingly, I do not deem the four "denied" paragraphs as "admitted," and rely on the factual record submitted, as I am required to do.

Second, Verizon asks me to strike Black's Affidavit on the ground that it was not notarized or made under penalty of perjury pursuant to 28 U.S.C. § 1746. (Reply at 4–5.) Verizon is incorrect. 28 U.S.C. § 1746 provides, in relevant part, that an unsworn declaration has the same force as a sworn declaration where the declarant attests to substantially the following: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date)." 28 U.S.C. § 1746(2). In her declaration, Black attests: "I swear or affirm that the above and foregoing representations are true and correct to the best of my information, knowledge, and belief." (Pl. Aff. at 4.) While Black does not directly copy or cite

28 U.S.C. § 1746, I find that her declaration substantially complies with the statute's requirements. Therefore, Black's declaration is admissible.[8]

## II. Whether the Alleged Conduct Was Sufficiently "Severe or Pervasive" to Constitute a Hostile Work Environment under Title VII and the NYSHRL

Although there is no genuine dispute as to whether the alleged conduct was sufficiently "severe," there is a genuine dispute as to whether it was sufficiently "pervasive."

Concerning severity, as a matter of law, the conduct at issue is not severe enough to be actionable under Title VII or the NYSHRL (before it was amended in 2019). The record, when read in the light most favorable to Black, contains facts supporting seven examples of harassment:

(1) on May 26, 2025, Reiner told Black that he saw a "beautiful" woman on TV the night before and inquired whether that woman was her (Pl. Tr. 117:22–118:2, 130:21–23);

(2) sometime between May 26, 2025 and July 11, 2025, Reiner told Black that he knew she and her brother had different fathers (which suggested to Black that Reiner had been researching her family) and said that this meant he was not her "real brother" (*id.* at 155:18–22, 157:2–158:3);

(3) between May 26, 2025 and roughly July 11, 2025, Reiner stared at Black once or twice per day (*id.* at 216:5–17);

(4) on July 11, 2025, Reiner asked about the tattoo on Black's breast, twice using the term "boob" (*id.* at 173:6–19);

(5) from around July 12, 2025 to October 9, 2025, Reiner stared at Black three to four times per day, including going out of his way to pass her desk (*id.* at 216:5–17; 221:5–16; 224:14–22);

---

[8] Verizon's objection to Black's Affidavit is irrelevant to my decision, in any event, since the two facts for which this Order cites Black's Affidavit are also supported by other record evidence. Black's attestation, "I have a tattoo on my left breast that is not visible unless you are looking down my shirt," is also found in her deposition testimony. (*See* Pl. Aff. ¶ 11; Pl. Tr. 172:15–16 ("I have never made [it] visible in my office.").) And Black's attestation that she began her leave of absence "on or around October 10, 2019" echoes statements by Verizon in its Rule 56.1 Statement. (*See* Pl. Aff. ¶ 33; Rule 56.1 Statement ¶¶ 69–70.)

(6) on October 9, 2025, while Black was speaking to her friend, Reiner glared at her, causing Black to hide behind her friend's desk (*id.* at 220:20–221:3); and

(7) on October 9, 2025, Reiner disingenuously reported that Black's presence near his cubical was making him uncomfortable (Investigation Report at D001371).

None of these alleged instances of harassment, individually or taken together, meets the Second Circuit's standard for severity. *See Agosto*, 982 F.3d at 102–03 ("star[ing]," "sneer[ing]," and "cat-call[ing]" not sufficiently severe); *Quinn*, 159 F.3d at 768 (supervisor making a single comment about the plaintiff's posterior and using a piece of paper to touch the plaintiff's breast not sufficiently severe); *Lewis*, 562 F. App'x at 28 (2d Cir. 2014) (supervisor "licking . . . his lips" and "leering" not sufficiently severe); *Beiter*, 50 F. App'x at 35 (summary order) (no hostile work environment claim where the plaintiff's supervisor, among other things, attempted to engage her in conversation about non-work matters and "walk[ed] through [plaintiff's] unit and watch[ed] [plaintiff] even when [the supervisor] was not assigned to that unit").

However, viewing the record in the light most favorable to Black, I find that a reasonable jury could conclude that the alleged harassing conduct was sufficiently pervasive to establish liability under Title VII and the NYSHRL. In particular, there are genuine disputes over the frequency and duration of Reiner's actions. With respect to frequency, Black's testimony contradicts Verizon's claim that the conduct was limited to "two (2) isolated comments that occurred approximately two (2) months apart" plus "sex-neutral staring." (*See* Mem. at 12, 14.) Black testified that Reiner glared at her approximately once or twice per day from May 26, 2019 to July 11, 2019, and that his glaring actually *increased* after Nichols spoke to Reiner about his behavior on July 12, 2019, to approximately three to four times per day. (Pl. Tr. 216:5–17.) With respect to pervasiveness, Black's testimony also gives rise to questions of material fact about whether Reiner's alleged harassing behavior continued well past July 2019 to the commencement of Black's leave on October 10, 2019. Specifically, Black testified:

> I mean, for me, this is months of me complaining, moving my desk, contacting the union, contacting HR, doing everything I could to stop him, I just want to work, just want to do my job, just want to try to continue to live, and what I was feeling at that time with my family, I was happy, and he took all of that away from me.

(Pl. Tr. 224:14–22.)

Therefore, viewing the record in the light most favorable to Black and resolving all ambiguities and drawing all reasonable inferences against Verizon, as the Court is required to do at summary judgment, *Cunningham*, 86 F.4th at 980, a reasonable jury could conclude that the conduct alleged was "sufficiently pervasive" or a "sufficient combination of" severe and pervasive under Title VII and the NYSHRL. *Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012); *see also Messer v. Fahnestock & Co. Inc.*, No. 03-cv-4989, 2008 WL 4934608, at *9 (E.D.N.Y. Nov. 18, 2008) (summary judgment denied where supervisor, among other things, "leered at [plaintiff] in a sexual kind of way" for "approximately five to six months").

The Second Circuit cases on which Verizon relies are distinguishable. In *Quinn*, the Second Circuit upheld the district court's grant of summary judgment for the defendant, finding that the majority of the alleged harassing incidents were barred by the statute of limitations and that the remaining two discrete incidents—in which the plaintiff's supervisor made a lewd comment about the plaintiff's posterior and used papers to touch her breasts—were neither severe nor pervasive enough to establish a hostile work environment claim. 159 F.3d at 768. Similarly, in *Lewis*, the Second Circuit affirmed the district court's grant of summary judgment where the alleged "leering" occurred "no more than a few times *a year*." 562 F. App'x at 28 (emphasis added). In *Agosto*, the Second Circuit held that allegations of a supervisor's "star[ing]," "sneer[ing]," "cat-call[ing]," and "clap[ping]" "on *a few occasions* over the course of a year" and an individual incident in which the supervisor suggestively licked a lollipop did not

meet the "severe or pervasive" standard. 982 F.3d at 102–03 (emphasis added). In *Beiter*, the plaintiff's supervisor touched her arm once and then, in a separate incident on the same day, her back once. 50 F. App'x at 35. The supervisor also yelled at the plaintiff in one instance and subsequently watched her because he thought she was taking too many breaks. *Id.* The Second Circuit upheld the district court's grant of summary judgment, finding, among other things, that the conduct was not "explicitly sexual." *Id.* at 36. In *Dayes v. Pace University*, the Second Circuit held that "a handful of comments . . . interspersed over a one-year period and uniformly mild in tone" did not create a hostile work environment. 2 F. App'x at 207. Here, by contrast, viewing the facts in the light most favorable to Black, Reiner leered at her multiple times a day from May 2019 to October 10, 2019, and on at least one occasion, made an explicit comment about her breasts. (Pl. Tr. 172:19–173:3, 216:5–17.)

The district court cases on which Verizon relies are not binding authority and, in any event, are likewise distinguishable. *Alva*, 2018 U.S. Dist. LEXIS 126299, at *13 (report and recommendation by magistrate judge, case settled before district judge ruling); *MacMaster*, 2007 U.S. Dist. LEXIS 72842, at *27 (granting summary judgment where supervisor commented that plaintiff would "look hot" in coveralls and putting his arm around plaintiff's shoulder occurred "[o]n occasions over . . . [a] decade"); *Godineaux*, 460 F. Supp. 2d at 422–23 (E.D.N.Y. 2006) (granting summary judgment where alleged harassing conduct occurred in a "few incidents . . . over a span of several months"); *DeSimone*, 2004 U.S. Dist. LEXIS 25621, at *21 (granting summary judgment where alleged harassing conduct occurred over a period of six weeks); *Spina*, 2003 WL 22434143, at *3 (granting summary judgment where plaintiff could recall, at most, six instances of harassment over the course of 15 months); *O'Dell*, 153 F. Supp. 2d at 386 (granting summary judgment where employee expressed his interest in plaintiff and

pursued her); *Holtz v. Rockefeller & Co., Inc.*, 1999 U.S. Dist. LEXIS 17682, at *5 (reversed on appeal).

### III. Whether the Alleged Conduct was Because of Black's Sex

There are material factual disputes concerning whether Reiner's alleged behavior was based on Black's sex, as opposed to some other reason. According to Verizon, Reiner's interest in Black was non-sexual and based on his discovery that she was the sister of one of the exonerated Central Park Five. (Mem. at 13; *see also* Pl. Tr. 149:3–25.) According to Black, while Reiner's alleged harassing behavior only began after he made this discovery, Black understood that he had developed a "sexual attraction" to her, "but in a hostile way." (Pl. Tr. 157:2–158:3.) The record shows that while ██████, another female employee, reported that Reiner stared at her, there is no evidence he stared at any male employees. (Investigation Report at D001377.) Thus, there is a triable issue of fact as to whether there is a sufficient nexus between the alleged hostile work environment and the protected characteristic at issue here (i.e., Black's sex).

### IV. Whether the Alleged Conduct Caused a Material Change to the Terms and Conditions of Black's Employment

There is a material factual dispute concerning whether the alleged hostile work environment caused a material change to the terms and conditions of Black's employment. Both parties appear to agree that taking a disability-based leave of absence constitutes a material change to the terms and conditions of one's employment, but the parties disagree over the cause of Black's need to go on disability-based leave. While Black argues that the alleged hostile work environment triggered the disability leave, Verizon raises potential other reasons—namely, Black's sister's illness, Black's concerns related to her marriage, and Black's prior PTSD diagnosis. (Opp'n at 7; Reply at 8.) This, too, is a triable issue of fact for the jury.

### V. Whether Verizon Can Be Held Liable for Reiner's Conduct as a Non-Supervisor Employee

Finally, there are disputed questions of material fact bearing on whether Verizon can be held liable for Reiner's conduct, given that he was not Black's supervisor. Black cites various portions of the record to support her argument that Verizon did not act sufficiently promptly and diligently to address the following issues: (1) that Reiner's staring continued for 13 weeks after she first reported his behavior to Nichols (Pl. Tr. 216:5–9); (2) that, after reporting the behavior, Black had to move desks, which still proved to be ineffective (Pl. Tr. 200:24–201:6, 203:11–21, 219:9–225:22); and (3) that Verizon did not conclude its investigation and discipline Reiner until November 2019, approximately six months after the first incident in May 2019 and four months after Black first reported his behavior in July 2019 (Reiner Decl. ¶ 17). Verizon, by contrast, cites evidence supporting its argument that it "appropriately addressed" all of Black's allegations: (1) Pruitt's testimony that she reported Reiner's conduct when she overhead him refer to Black's "boob" (Pruitt Tr. 17:2–17); (2) Black's testimony that Verizon granted her request to switch desks (Pl. Tr. 203:11–21); (3) documentary evidence that both Nichols and Murray told Reiner to stay away from Black (Pl. Tr. 186:15–21, 187:10–12, 193:14–22; Reiner Tr. 15:6–12; Oct. 2, 2019 Meeting Report I); (4) Reiner's statement in his declaration that he was disciplined for unprofessional workplace conduct (Reiner Decl. ¶ 17); and (5) Black's testimony that, following these incidents, Verizon made its Garden City service center employees undergo additional training on Verizon's Code of Conduct (Pl. Tr. 246:2–6.).

Accordingly, there is a genuine dispute over whether Verizon's remedial response was sufficiently "unreasonable" to give rise to liability for Reiner's conduct as an employee in a non-supervisory role. *Duch*, 588 F.3d at 763.

## CONCLUSION

For the reasons stated above, genuine questions of material fact preclude a determination as a matter of law as to Black's hostile work environment claims under Title VII and the NYSHRL. Accordingly, I deny Verizon's Motion for Summary Judgment (ECF No. 65).

Dated: Central Islip, New York
       March 4, 2025

                                    */s/ Nusrat J. Choudhury*
                                    NUSRAT J. CHOUDHURY
                                    United States District Judge